```
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2    ------------------------------x
                                          23-CR-475(DLI)
 3    UNITED STATES OF AMERICA,
                                          United States Courthouse
 4                                        Brooklyn, New York

 5              -versus-                  March 22, 2024
                                          12:00 p.m.
 6    JAMES YOUNG,

 7              Defendant.

 8    ------------------------------x

 9         TRANSCRIPT OF CRIMINAL CAUSE FOR STATUS CONFERENCE
                 BEFORE THE HONORABLE DORA L. IRIZARRY
10                 UNITED STATES SENIOR DISTRICT JUDGE

11    APPEARANCES

12    For the Government:        UNITED STATES ATTORNEY'S OFFICE
                                 Eastern District of New York
13                               271 Cadman Plaza East
                                 Brooklyn, New York 11201
14                               BY:  STEPHANIE PAK, ESQ.
                                      MATTHEW HAGGANS, ESQ.
15                               Assistant United States Attorneys

16    For the Defendant:        FEDERAL DEFENDERS OF NEW YORK
                                 BY:  ALLEGRA GLASHAUSSER, ESQ.
17

18    Also Present:             SOPHIA PAPAPETRU, MDC Legal
                                 ROBERT BEDDOE, MDC Health
19

20

21    Court Reporter:           Rivka Teich, CSR, RPR, RMR, FCRR
                                 Phone:  718-613-2268
22                               Email:  RivkaTeich@gmail.com

23    Proceedings recorded by mechanical stenography.  Transcript
      produced by computer-aided transcription.
24

25
```

STATUS CONFERENCE

1              (In open court.)

2              THE COURTROOM DEPUTY:  All rise.  Criminal cause for

3     a status conference, docket 23-CR-475, United States vs. James

4     Young.

5              State your appearances.

6              MS. PAK:  On behalf of the Government, Stephanie

7     Pak.  With me at counsel table is Assistant United States

8     Attorney Matthew Haggans, as well as representatives from the

9     MDC, representative MDC legal and MDC health, Sofia Papapetru

10    and Robert Beddoe.  Good afternoon, your Honor.

11             THE COURT:  Good afternoon to all of you.  Please

12    have a seat.

13             MS. GLASHAUSSER:  Good afternoon, your Honor.

14    Allegra Glashausser representing James Young who is seated

15    next to me.

16             THE COURT:  Good afternoon to all of you.  I will

17    ask everyone, please, to remain seated for this proceeding.

18             It's unfortunate that we have to be here because

19    since the last time that we were here, given the protocols

20    that were put into place, discussions that were had by the

21    Government with the Bureau of Prisons, specifically the MDC,

22    conversations I had with the warden which I disclosed to the

23    parties the last time we were here, and the open communication

24    that there has been between the United States Attorney's

25    Office and defense counsel -- while issues came up they were

STATUS CONFERENCE

1  being addressed fairly quickly and it seems reasonably so it

2  did not require any court intervention.  It's just not clear

3  to me how all of this could have fallen apart.

4         The Court had been regularly receiving the status

5  reports on a weekly basis from the Government.  And on

6  March 13, in that weekly report, the Government reported that

7  Mr. Young was continuing to receive his antibiotic therapy,

8  his physical therapy, and occupational therapy.  And also

9  based on medical records from the medical facility, indicated

10 that Mr. Young had received a monthly exam with a primary care

11 physician who -- and this is critical -- who determined that

12 Mr. Young should continue the current care plan.

13        Then there was an issue about getting meals that had

14 been consistent with his observation of Ramadan and apparently

15 that had been addressed as well.

16        Then, things fell apart.  It fell apart because of

17 the intervention of the Bureau of Prisons, of the MDC.  The

18 Court was informed by letter from the Government on March 14,

19 this is now the very next day after I received the status

20 report -- I have to say, I do appreciate getting the courtesy

21 copies immediately, I appreciate that very much from both

22 sides -- informing the Court that Mr. Young had been

23 discharged from the medical facility and returned to the

24 custody of the Bureau of Prisons at about 7:00 o'clock that

25 night.  So that was March 14.  The Marshals had informed the

STATUS CONFERENCE

1   Government about this shortly after Mr. Young had been taken

2   into custody.  According to the Government's letter, defense

3   counsel was informed as well as soon as the Marshals learned

4   of the discharge.

5          The Government indicated it would look into the

6   situation and report back to the Court promptly, which it did

7   the very next day.  Apparently, based on the Government's

8   discussions with MDC counsel and the medical facility staff,

9   that day, March 15, apparently the medical staff had assessed

10  Mr. Young's condition on March 13 and determined that he was

11  medically fit to be returned to the MDC.  Notably, the status

12  that was provided to the Court on March 13 did not indicate

13  that, but as I said, rather indicated that the primary care

14  physician had determined that Mr. Young should continue the

15  current care plan, which meant being at the facility, getting

16  the medical treatment that he was getting.

17         And in addition to that, it wasn't mentioned in this

18  particular letter of March 13, but, there had been ongoing

19  discussions about scheduling and rescheduling a surgery

20  consult.  There seems to be no dispute that Mr. Young is in

21  need of some surgery.  The question is the scheduling of the

22  surgery itself, if my recollection serves me well.

23         What is troubling is how the MDC medical staff

24  apparently went about its assessment that Mr. Young could

25  return to the MDC, that apparently the medical facility staff

STATUS CONFERENCE

1   agreed with, even though what they reported a few days before.

2   They claim the wound was healing without leakage.  He was able

3   to change his wound dressings and better perform his daily

4   living tasks, get in and out of bed without assistance, and a

5   whole load of medical records were attached.  The medical

6   staff apparently learned that Mr. Young would be transferred

7   back to the MDC the morning of March 14.

8         There are multiple problems with all of this.  First

9   of all, there seems to be contradiction between the ongoing

10  assessment and the assessment that was made by the medical

11  staff from the MDC.  But most importantly, and what brought

12  this Court on the verge of holding the MDC and the Government

13  in contempt for that matter, was the failure to comply with

14  court orders.

15        The last order that I issued was that Mr. Young was

16  not to be removed, transferred, from the medical facility

17  without prior notice to the Government, to defense counsel and

18  to the Court.  That doesn't mean, oh, by the way we're telling

19  you that we're moving him to the MDC.  No.  That's not what I

20  call notice.  And anyone who argues that to me today will not

21  do that because it's facetious at best.  It was intended to

22  give all of us the opportunity to get together and have a

23  serious discussion about whether or not this was the best way

24  to proceed in Mr. Young's case, which is a very unusual

25  situation.  This is not the run of the mill medical case that

STATUS CONFERENCE

1    the Bureau of Prisons confronts itself with.

2         So I did get a letter as well from defense counsel

3    on March 16 which provided additional information.  It

4    presents a different picture of how the medical assessment was

5    made to begin with and what the medical records say as well.

6         It does not seem from the description, I don't want

7    to get into it in too much detail, the medical records

8    indicate the infection is current.  It doesn't say anything

9    about the assessment made of the wounds.  The MDC doctor

10   apparently did not examine Mr. Young.  He claimed Mr. Young

11   didn't cooperate and instead wanted to discuss the issue with

12   the timing of meals during Ramadan.

13        It just defies any kind of understanding or

14   reasoning how a doctor can make an assessment of a person's

15   condition without conducting his or her own examination of a

16   person.  He was supposed to have an offsite wound care

17   appointment sometime next week.  I highly doubt that was going

18   to happen with him being transported to the MDC, given the way

19   that the MDC schedules things and does things.  The record

20   also says that he was still waiting for the initial orthopedic

21   surgery appointment that had to be rescheduled due to

22   staffing.

23        Counsel explains that the medical records do not

24   state that Mr. Young was medically fit to go to the MDC, but

25   that the plan was for him to return to MDC Brooklyn as soon as

7

STATUS CONFERENCE

1   staffing will allow.  I'm not sure what that means.  It seems

2   that there was still a lot of medical treatment that had to be

3   accomplished before that could happen, including the

4   orthopedic surgery consult, the wound treatment appointment,

5   and so on.

6          Then he gets sent to the MDC without his

7   medications.  Here we go again.  Contrary to what the MDC

8   doctor said, apparently, Mr. Young's medical records from the

9   facility indicate that Mr. Young required extensive assistance

10  with his daily living activities and that he was benefiting

11  from the physical therapy and the treatments overall that he

12  was getting and he needed the continued medication is.  There

13  is no way he's going to get the daily therapy at the MDC.

14         I don't know who wants to go first here.

15         I know I only summarized some of what you provided

16  in your letter, Ms. Glashausser, I don't know if there is

17  anything else that you want to report that is more current

18  than that.

19         MS. GLASHAUSSER:  I think your Honor hit the

20  important bits.  I did see Mr. Young at MDC just two days ago

21  where he was wheeled out in his yellow jumpsuit.

22         THE COURT:  That was the other thing, yes.  The

23  scarlet letter jumpsuit.

24         MS. GLASHAUSSER:  Yes.

25         THE COURT:  I'm sorry, I interrupted you.

8

STATUS CONFERENCE

1          MS. GLASHAUSSER:  No, thank you, your Honor.

2          He is ostracized in the same way that your Honor

3   noted was happening in December.  These are similar concerns.

4   He has one pair of underwear.  He does not have an undershirt,

5   today he just has the jumpsuit on.  It's all the same things

6   that were happening in December.  Nothing seems to have

7   changed significantly with his medical condition.  He still

8   has the open wound, which is what he's awaiting the surgical

9   consult for.  I don't think MDC disputes the medical issues,

10   but here we are.  He has not received his medications that he

11   was taking at Windsor Park obviously.

12          THE COURT:  Any?

13          MS. GLASHAUSSER:  My understanding, I don't know if

14   we need to get into the details on this, there was one

15   medication, you can see it in his Windsor Park records.  One

16   they tried recently that had given him an allergic reaction.

17   Right after my visit with Mr. Young, they offered him that

18   medication.  He said that was the one that caused that

19   reaction.  It's well-documented in the record.  Other than

20   that, he has not received his medication.

21          Your Honor, he's locked in his cell the vast

22   majority of the time, more so than the other incarcerated

23   people.  Because everyone at the facility is -- they know

24   that -- he's being ostracized for a reason.  They are

25   concerned about interacting with him.  The other incarcerated

STATUS CONFERENCE

1    folks do not allow him to use the phone or other common

2    facility items because of their concern of the infection.

3    He's explained that also he has been unable to shower because

4    of that concern.

5            THE COURT:  Ms. Pak?

6            MS. PAK:  The Government would acknowledge that your

7    Honor's timeline of events up to today's status conference is

8    accurate.

9            As the Court ordered, the Government is here with

10    MDC legal and MDC health so the parties can better address

11    some the circumstances that led us here today.

12            THE COURT:  Ms. Papapetru, do you want to address

13    these issues, please?

14            MS PAPAPETRU:  I will address a few of the issues.

15            This is the first I'm hearing in regard to the

16    concerns about the undergarments that Mr. Young is missing.

17    So that's something that I'll address immediately with the

18    unit manager.  And with respect to his safety concerns and

19    using the shower and the phone, I have not heard of that.  I

20    will refer that to the unit manager and the case manager.

21            With respect to Mr. Young being returned to the

22    institution, Mr. Beddoe will speak on that further.  However,

23    I was not notified.  I do in fact understand how significant

24    this is and that your Honor was to be notified prior to his

25    movement.  And had I been notified, I would have immediately

STATUS CONFERENCE

1   notified the Government so that they can relay that

2   information.

3        THE COURT:  The point of the order was not just to

4   say this, by the way, this is what we're doing, we're

5   transferring him.  No.

6        The point of providing notice was so that everyone

7   could be heard prior to him being transferred to avoid what

8   happened here.  That's the concern.  Because he was making

9   progress, and so now we're setting back his progress because

10  for some reason that I don't understand, MDC wants him back

11  there.

12       I'm just not understanding how the MDC was not aware

13  of the standing order of the Court.  The warden was aware of

14  the standing order of the Court.  I had every assurance from

15  the warden that court orders would be carefully obeyed.  I

16  advised the warden that I was pretty sick and tired of wardens

17  giving lip service to the judges of this court about how they

18  would comply with court orders.  This has been a sore spot for

19  forever.  Twenty years I've been on this court, it's been like

20  that from day one.  It's been addressed with every single

21  director of the national director of the BOP that has been

22  appointed to that position since I've been on this court,

23  there have been multiple.

24       Perhaps we should hear from Mr. Beddoe about what is

25  going on here, because I don't understand.

STATUS CONFERENCE

1          MS PAPAPETRU:  One point, your Honor.

2          THE COURT:  Yes.

3          MS PAPAPETRU:  I assure you, the warden was not made

4    aware of any movement because he would have, as he assured

5    you, that would have been communicated to you immediately.  He

6    found out --

7          THE COURT:  Who makes this decision?  Don't people

8    talk to each other over there?  They should know -- this case

9    has reached the notice of the public.  There have been news

10   articles written about this.

11         MS PAPAPETRU:  Mr. Beddoe will give more detail.

12   However, the movement occurred significantly faster due to a

13   variety of reasons.  Normally the movement would have taken at

14   least three days to occur; however, it took less than 24 hours

15   in this instance.

16         THE COURT:  Why?  That's incredibly interesting to

17   me.  Because I have never found the MDC to move that quickly.

18   Rarely.  So why all of a sudden now?  I would like to know.

19         MR. BEDDOE:  Is it my turn?

20         THE COURT:  Yes, sir.

21         MR. BEDDOE:  I'm a health service administrator at

22   MDC Brooklyn.  I don't know if I've been before you before.

23         THE COURT:  I don't think so.

24         MR. BEDDOE:  Myself and Dr. Bailer (ph) the clinical

25   director.

STATUS CONFERENCE

1    THE COURT:  I know who he is.

2    MR. BEDDOE:  He may have appeared before you as

3  well.

4    THE COURT:  Several times.

5    MR. BEDDOE:  In an effort for us to be more

6  efficient, what we started doing was going to the nursing

7  homes to make rounds ourselves to make sure their care was

8  appropriate, timely, and affective for all the inmates who are

9  there.  Because while they are not in federal building, we

10  still are responsible for their care and what happens to them.

11    So on the 13th we started to make our rounds.  We

12  try to do it frequently, we do our best to make this on a

13  monthly or as frequently as we can rounds.

14    We saw Mr. Young there at the facility.  We

15  discussed his case there.  Dr. Bailer who in discussions with

16  Mr. Young understood from what he said he was not needing any

17  assistance and he was not getting any physical therapy or

18  wound care services at the facility when we spoke to him that

19  morning.  He was able to stand --

20    THE COURT:  Did you all bother to review his medical

21  records before you examined him?

22    MR. BEDDOE:  Before examining him at the facility?

23    THE COURT:  Yes.

24    MR. BEDDOE:  We went -- we have some information

25  available to us, but obviously there is --

STATUS CONFERENCE

1          THE COURT:  The answer is no.  I can tell from the

2    way you're doing the courtroom shuffle that the answer is no.

3          I don't understand how any doctor worth his or her

4    salt in any way could ever go to examine somebody without

5    first reviewing the medical records of that person.

6          MR. BEDDOE:  You're correct.  I understand what

7    you're saying.

8          THE COURT:  Are you a doctor?

9          MR. BEDDOE:  I'm a paramedic and administrator of

10   the department.

11         THE COURT:  You're a paramedic.  You're in no

12   position to assess as a paramedic.  You do not have the level

13   of expertise of as a paramedic.  We should have had Dr. Bailer

14   here.

15         MR. BEDDOE:  I'm here in his -- he's not in this

16   week.  I'm trying to do my best to articulate what he --

17         THE COURT:  You send a paramedic.  A paramedic is

18   not qualified to make any of these assessments.

19         MR. BEDDOE:  I wasn't making the assessment.  I

20   understand your frustration.  I was a party to being there.

21   With Mr. Young being able to maintain all his activities of

22   daily life, his statements that he was receiving no wound

23   care, and able to independently do his wound care and he was

24   not getting any physical therapy --

25         THE COURT:  That's not consistent with what the

STATUS CONFERENCE

1  medical records --

2          MR. BEDDOE:  Those are not our records.  This is

3  what he's telling us.

4          THE COURT:  The medical facility has the records.

5  You go to the medical facility.  You don't look at the medical

6  records?  The Government was able to get the medical records.

7  If Dr. Bailer is going to make some assessment then he looks

8  at the medical records.  What discussion was had with the

9  medical facility people there?

10          MR. BEDDOE:  That day we spoke to all of the inmates

11  that we had at that the facility, which we have several.  We

12  spoke about each one, what is their status, can they return.

13          THE COURT:  You spoke to the inmates.  That doesn't

14  tell me that you spoke to the medical providers.

15          MR. BEDDOE:  I'm sorry if I didn't say that clearly

16  enough.  We spoke to each individual in our custody that was

17  there, as well as director of nursing to discuss each case

18  with her, the person in charge of the overall care there and

19  management of the facility.  We spoke about each individual

20  case.  So that's before we make any discussion we take into

21  consideration what they are telling us, what we saw, and that

22  way if there is a change we can make sure we make that change.

23  We spoke to that head of the facility before we made any

24  decision.

25          THE COURT:  None of that is consistent with just

STATUS CONFERENCE

1  looking at the first page of medical records that were part of

2  Exhibit A that was provided by Ms. Glashausser with her

3  letter.  Just in that very week, that very week that you all

4  went there, two days before, there is an entry for the two

5  days before that he requires extensive assistance with respect

6  to daily living activities.  He benefits from -- what is OT?

7          MS. PAK:  Occupational therapy.

8          THE COURT:  And PT, physical therapy, five times

9  weekly.  He's continuing to get medication.  And Mr. Young

10  explained to them because of Ramadan he had some limitations

11  about the timing of when he could take certain medications,

12  which explains why he refused medications at certain periods

13  of time when I guess they were making the rounds to offer the

14  medication.  But it's not because he doesn't need the

15  medication.

16          Doctors also have to be mindful of people's

17  religious faith.  Heaven forbid a surgeon perform a

18  transfusion on a Jehovah's Witness observer.

19          Is there anything else that you did while you were

20  there?

21          MR. BEDDOE:  If you will permit.  When we were

22  there, I know the medical records state that he was not

23  independent with his activities of daily life, the things he

24  needs to be able to do to be inside of a prison.  But it was

25  noted when we were there he was able to stand, dress himself,

STATUS CONFERENCE

1  put on his immobilizing device for his knee and able to stand

2  and face us and speak directly to us.

3       It was noted that the interaction we had was

4  confrontational toward myself and Dr. Bailer when we met him.

5  It is noted that we did witness him being able to do all the

6  things that he needed to do in order to facilitate his

7  activities of daily life.

8       THE COURT:  How many minutes were you there?

9       MR. BEDDOE:  I can say it was 15 to 20 minutes, I

10  can't tell you exactly.  But it seems 15 to 20 minutes at

11  minimum.

12       THE COURT:  There was no physical medical exam that

13  Dr. Bailer performed, correct?

14       MR. BEDDOE:  So we intended to do that, but the

15  confrontation with him -- he stood, faced me and it was

16  assertive or aggressive to us.  It was not, it didn't seem

17  like an appropriate time for us to do that --

18       THE COURT:  Based on not having done a medical

19  examination, nonetheless a decision was made based on the ten

20  to 15-minute observation that it was appropriate to transfer

21  him without having reviewed the medical records.

22       MR. BEDDOE:  He also told us that he was not getting

23  services there and he was okay to return during that visit.

24  There was in that short time frame --

25       THE COURT:  He who, Mr. Young?

STATUS CONFERENCE

1          MR. BEDDOE:  Mr. Young.  We also spoke to the

2    physician that was at the facility because he wasn't there

3    that day we made sure we spoke to him verbally --

4          THE COURT:  Who wasn't there?

5          MR. BEDDOE:  There is a physician who oversees the

6    nursing home, just like we have a physician who oversees the

7    prison, Dr. Bailer clinically oversees the prison, there is a

8    physician that oversees the nursing home.

9          THE COURT:  Yes.

10         MR. BEDDOE:  So we made sure we spoke to him as well

11   and that he concurred that it would be appropriate for him to

12   return to MDC Brooklyn.

13         THE COURT:  You wish to respond to what Mr. Beddoe

14   has said, Ms. Glashausser?

15         MS. GLASHAUSSER:  Yes, your Honor.  Thank you.

16         Of course this is the first I'm hearing that MDC

17   apparently spoke to them saying that they spoke to the doctor

18   who oversees the nursing home.  I think that your Honor should

19   be relying on the records that, as your Honor has pointed out,

20   contradict what MDC is reporting.  Windsor had just assessed

21   him as needing continued care.  It wasn't a random assessment,

22   it was based on the care for him going on for months.

23         This is the first time MDC visited him at that

24   facility although he had been there since December.  It was

25   Windsor Park taking care of him.  As your Honor pointed out,

STATUS CONFERENCE

1   they believed he needed extensive assistance and all of this

2   physical therapy.  The next page also state how his wound had

3   been assessed that same day, March 11, his skin was assessed.

4   Continued medication was ordered.  He still has the wound and

5   the infection and the other physical problems that led to your

6   Honor ordering him to go to the nursing home in the first

7   place.  None of that has changed.  Nothing in the Windsor park

8   records suggests it changed.  And MDC didn't examine him.

9           So it is puzzling to me as well why he was moved to

10  MDC.  Nothing about the Court's order -- the reason the Court

11  ordered him to be in the nursing home in the first place still

12  exists.  I think your Honor should order that he be returned

13  there.  And it's especially true he's not getting any services

14  at MDC and is just locked in his cell, ostracized from

15  everybody else.

16          THE COURT:  Sorry to interrupt you.  Has he gotten

17  any of his medications?

18          THE DEFENDANT:  No.

19          MS. GLASHAUSSER:  He has now the gauze and the

20  Tegaderm patches that he got after some delay.

21          THE COURT:  Medicine.

22          MS. GLASHAUSSER:  Not medicine.  He's saying he

23  didn't even get the Tegaderm patches.  He got gauze and

24  Betadine, and that's all.  He still has the infection.  He's

25  waiting to have the surgery that will hopefully close-up the

STATUS CONFERENCE

1    wound and address the medical problem that he has.

2            As far as I can tell, it seems MDC made some sort of

3    snap judgment in this brief meeting that morning to return him

4    without looking at the medical records, without assessing what

5    was actually going on with Mr. Young.  The staff and the other

6    incarcerated people at MDC are significantly concerned that

7    he's back on the unit.  They are concerned for their own

8    well-being, which means that just all falls on Mr. Young.

9    He's not able to -- he feels unsafe in addition to not being

10   able to move at all about the facility.  And is certainly not

11   getting any physical therapy or any sort of therapy.

12           It really it strikes me -- when the MDC says it was

13   not the appropriate time to do a medical exam, they didn't do

14   a medical exam.  It seems extremely startling that they deemed

15   him medically fit to return to MDC.

16           THE COURT:  They didn't do a medical exam.  And they

17   didn't look at the medical records.

18           MS. GLASHAUSSER:  Right.

19           THE COURT:  That's medical malpractice.  If I go to

20   a doctor and he makes some sort of diagnosis just because he

21   looked at me for ten to 15 minutes, and maybe for that ten to

22   15 minutes I was able to get up and off the changing table,

23   but then when I go home I'm like a physical wreck and I can't

24   move because I did exert myself at that moment, and there is

25   no examination of prior medical history or anything else,

STATUS CONFERENCE

1  that's medical malpractice.  And then knowing that he is on

2  medication, that he needs this medication to control the

3  underlying condition, he gets sent without the medication and

4  he's not provided the medication.  It's very clear in the

5  records that were provided by Ms. Glashausser that he did have

6  a reaction to one of the medications, Humira.

7          Mr. Young, let me say this to you, it is not helpful

8  to be confrontational ever, okay.  Just a word of advice,

9  okay.  It's not going to help your situation any.

10          THE DEFENDANT:  Yes, ma'am.

11          THE COURT:  As frustrating as it may be, I get it,

12  it's frustrating.  It's not easy to live in pain or with a

13  debilitating condition, but it is not helpful for you, it

14  doesn't help your situation any to be confrontational with

15  these folks.  Because now you see they are going to sit here

16  and use that against you.  Do you understand what I'm saying?

17          THE DEFENDANT:  Yes, ma'am.

18          THE COURT:  Okay.  But in any event, it does seem to

19  me that the decision to transfer the defendant to the MDC was

20  done havoc without basis of information.  And I'm ordering him

21  transferred back to the medical facility that he was in.

22          And before the MDC decides to transfer him back to

23  the MDC, number one, notice must be given immediately to the

24  Government and to Ms. Glashausser and to the Court.  And there

25  shall be no movement of the defendant until we have had an

STATUS CONFERENCE

1   opportunity -- I want to be perfectly clear, Ms. Papapetru is

2   an attorney so she will understand -- until the Court and the

3   Government and defense counsel have had an opportunity to

4   discuss the matter and to review whatever records and talk to

5   whatever medical professionals are necessary to determine that

6   in fact that is appropriate.

7           And he shall be transferred forthwith and no later

8   than tomorrow.  You were able to get him transferred out of

9   Windsor in one day, you can do that today and send him back.

10          This is shameful.  And why Ms. Papapetru wasn't

11  advised knowing that there had been court orders issued here

12  in connection with the medical treatment and the housing, not

13  just the medical treatment but the housing of Mr. Young.  And

14  the warden assured me that he was watching, keeping an eye on

15  Mr. Young's case.  And why Ms. Papapetru and the warden were

16  not advised of this change is something that I think,

17  Ms. Papapetru, you and the warden need to address at the MDC.

18  They can't go around doing things in secret.

19          The next time, I don't care where Dr. Bailer is, if

20  I need a medical person, I want the doctor here.  Don't send

21  me an EMT.  And I have great respect for EMTs, you do a

22  valuable service to this country, but you're just not

23  qualified to make any of these assessments.  It just is what

24  it is.

25          Is there anything else that I need, Ms. Papapetru?

STATUS CONFERENCE

1    Do you need a written order for this or does the oral order of

2    the Court suffice?

3            MS PAPAPETRU:  It suffices, your Honor.

4            THE COURT:  Anything else that that the parties need

5    to discuss with me today?  I know we have a conference set for

6    May 7 in the case.

7            MS. PAK:  That is correct, your Honor.  I believe an

8    order of excludable delay has already been entered.

9            THE COURT:  I believe so, yes.

10           MS. PAK:  Your Honor, if I may?

11           THE COURT:  Yes.

12           MS. PAK:  As to your Honor's order issued today,

13   just to be prudent, the Government is asking that it be put in

14   a minute entry order so there is some sort of text order.

15           THE COURT:  Yes, that will automatically be done.

16   It will be done in the minute order.  And the transfer should

17   be done by 5:00 o'clock by tomorrow afternoon.

18           MS. PAK:  Thank you, your Honor.  Nothing further.

19           (Continued on next page.)

20

21

22

23

24

25

STATUS CONFERENCE

1              THE COURT:  Thank you.  If there nothing else,

2    Marshals, you may take charge.  Thank you.

3              MS. GLASHAUSSER:  Thank you, your Honor.

4              (Whereupon, the matter was concluded.)

5                    *    *    *    *    *

6    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

7

8    /s/ Rivka Teich
     Rivka Teich, CSR RPR RMR FCRR
9    Official Court Reporter
     Eastern District of New York

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25